## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| **LAWRENCE BAZUAYE** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) **Case No. 4:23-cv-00283-HFS** |
| | ) |
| **INTERNATIONAL ASSOCIATION OF** | ) |
| **MACHINISTS & AEROSPACE WORKERS** | ) |
| **LOCAL LODGE 778 AND HONEYWELL** | ) |
| **FEDERAL MANUFACTURING &** | ) |
| **TECHNOLOGY, LLC** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## AMENDED COMPLAINT

Plaintiff, Lawrence Bazuaye, hereby sets forth this action, a claim under Section 301 of the Labor Management Relations Act (LMRA) act and Section 1981 against Honeywell Federal Manufacturing & Technology, LLC ("Honeywell") and International Association of Machinists Aerospace Workers Local Lodge 778 ("Local 778") and alleges claims under the Missouri Human Rights Act, Title VII and the Americans with Disabilities Act against Honeywell.

## JURISDICTION AND VENUE

1.    Plaintiff is a resident of Missouri.

2.    Defendants Honeywell and Local 778 both operate in and transact business in Missouri and within the City of Kansas City.

3.      This Court has personal jurisdiction over Defendants because Defendants can be found in, reside in, and/or transact business in this judicial district.

## FACTUAL STATEMENT

4.      Plaintiff, Lawrence Bazuaye, an African-American male and practicing Christian became employed by Defendant Honeywell as a journeyman toolmaker in September 2015.

5.      Honeywell is a government contractor and purported to be acting in the interest of its role as a government contractor at all times described herein.

6.      Plaintiff was also a member of Local 778.

7.      Not long after the Covid-19 ("Covid") pandemic, which began in approximately March 2020, Honeywell began to institute rules about who was and who was not to be wearing a mask in the workplace.

8.      Also, during the Covid pandemic, the Honeywell, after a Covid vaccine became available, began to email employees requiring employees to get the vaccine for Covid.

9.      Honeywell's rules advised staff if they had any questions about the mask requirement or vaccine requirement, to talk to management or human resources.

10.     Mr. Bazuaye frequently inquired about the mask and vaccination requirements of Honeywell but received little to no response to help guide his daily conduct at work, or how to address Honeywell's requests of him with respect to such issues.

11.     Mr. Bazuaye sent email communication to Human Resources staff expressing

his concerns about Honeywell's requirements to force vaccination on its employees.

12.     In approximately September 2021 Honeywell sent paperwork to its employees, including Mr. Bazuaye, seeking attestation about vaccination status, as well as paperwork pertaining to exemptions from getting a vaccination for Covid.

13.     Mr. Bazuaye was never advised that he would be subject to disciplinary action if Plaintiff did not indicate his personal vaccination status.

14.     Mr. Bazuaye ultimately did not submit paperwork about his vaccination status.

15.     On or about October 5th, 2021, Honeywell announced it would mandate all of its employees at its Kansas City location to receive one of the three COVID-19 vaccinations.

16.     The vaccinations for COVID-19 were described in the media as mRNA vaccines.

17.     The mRNA technology had never been deployed as a vaccine prior to the COVID-19 rollout.

18.     Before Honeywell's vaccine mandate rollout and decision-making about how to apply employee religious accommodation requests the waning effectiveness of the vaccine was well established such that it was apparent that there was no need, other than animus, to scrutinize religious accommodation requests

19.     By July 2021, an Israeli study showed that out of 7,700 new COVID-19 cases, 40% involved vaccinated people whereas only 1% involved patients previously infected with COVID-19.

20.     In fact, the declining effectiveness of COVID-19 vaccines worldwide was well-known by July 2021.  https://www.cnbc.com/2021/07/23/delta-variant-pfizer-covid-vaccine-39percent-effective-in-israel-prevents-severe-illness.html.

21.     In August 2021, Anthony Fauci appeared on CBS's *Face the Nation* and reported finding that "the level of virus in the nasopharynx of people who are vaccinated who get breakthrough infections, it's really quite high and equivalent to the level of virus in the nasopharynx of unvaccinated people who get infected."

22.     In the same interview, Fauci acknowledged, "[s]o we know now that vaccinated people who get breakthrough infections can spread the virus to other people."

23.     In October 2021, an article in *The Lancet* similarly stated that:

> fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts.

24.     In October 2021, researchers published an article on preprint server medRxiv entitled, "No Significant Difference in Viral Load Between Vaccinated and Unvaccinated, Asymptomatic and Symptomatic Groups When Infected with SARS-CoV-2 Delta Variant."

25.     The nationwide rollout of the COVID-19 vaccines received unparalleled media coverage  compared to any other vaccine rollout in history spurring the curiosity of the public and Mr. Bazuaye to become educated about the new vaccine.

26.     Individuals curious about mRNA technology could watch the TEDx Beacon Street talk by Tal Zaks, a then-chief medical officer for Moderna, Inc. who stated "we've been living this phenomenal digital scientific revolution, and I'm here today to tell you, that

we are actually hacking the software of life" and then explained that Moderna thinks of mRNA like an "operating system."

27.     The title of Tal Zaks's speech was "Rewriting the Genetic Code: A Cancer Cure in the Making."

28.     During Zaks's speech about mRNA technology (a speech given before the COVID-19 pandemic) stated, "In every cell there's this thing called messenger RNA or mRNA for short, that transmits the critical information from the DNA in our genes to the protein, which is really the stuff we're all made out of. This is the critical information that determines what the cell will do. So we think about it as an operating system.... So if you could actually change that… if you could introduce a new line of code, or change a line of code, it turns out that has profound implications for everything, from the flu to cancer."

29.     The mRNA vaccines were not approved by the FDA at the time of the mandate, rather they were being provided under the Emergency Use Authorization while final formal approval was pending.

30.     The above information led many Americans to conclude the COVID-19 vaccines presented an immoral medical procedure and that to receive such a vaccine would violate their religious moral conscious in some way.

31.     At various points, prior to the vaccination mandate, masks were voluntary and for others, they were mandatory.

32.     For instance, masks were not mandatory when in the bathroom, or when eating.

33. The rules were eventually applied differently to individuals depending on their vaccination status, even though vaccination had little to no discernable effect on preventing transmission of COVID-19.

34. Honeywell's rules advised staff if they had any questions about the mask requirement to talk to management or human resources.

35. Likewise, many employees at Honeywell, including Mr. Bazuaye had a deeply held belief that it was immoral to receive the COVID-19 vaccine.

36. Upon rolling out the vaccine mandate, Honeywell threatened its employees by telling them if they did not receive the COVID-19 vaccine and did not receive a medical or religious exemption, they would face disciplinary action, including unpaid leave and/or termination – in fact, Honeywell did not end up firing employees even though Honeywell denied their exemption request.

37. The COVID-19 vaccine was developed and promulgated during the Trump administration, and former president Trump endorsed the vaccine and indeed himself received the COVID-19 vaccine.

38. The COVID-19 vaccine mandate implemented by Honeywell was the result of requirements of the Biden administration.

39. The day after the mandate was announced and initial forms were promulgated by Honeywell, on about October 6, 2021 Mr. Bazuaye submitted his religious accommodation request to Honeywell to exempt him from receiving the Covid vaccine.

40. The next day, October 7, Mr. Bazuaye received a written warning about his

failure to state his vaccination status as to COVID-19.

41.     Mr. Bazuaye objected to this as he understood other, Caucasian employees, had not submitted a statement as to their personal vaccination status, but had not been written up.

42.     Also the same day, Mr. Bazuaye was called into a meeting with Human Resources at which time he was questioned about his personal mask etiquette.

43.     Between October 6 and October 13th or 14th Mr. Bazuaye was called into several meetings about his request for a religious exemption from the Covid vaccine.

44.     During the course of those meetings, Honeywell's Human Resources representative harassed Mr. Bazuaye about his religious practices and asked him about his consumption of Tylenol  - which allegedly had been tested in connection with abortion - in effort to humiliate him for his request to be exempt from the vaccine requirements.

45.     Multiple other employees of Honeywell held religious objections and sought exemptions from COVID-19 vaccines, but Mr. Bazuaye was one of the first to file his exemption request.

46.     It is well-established that the legitimacy of a religious belief or practice need not be acceptable, logical consistent, or comprehensible to be protected religious beliefs.[1]

47.     It is also well-established that when a person articulates religious beliefs, their beliefs are not rendered illegitimate merely because he or she cannot articulate them with the

---

[1] *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("[W]hat is a 'religious' belief or practice ... is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.*").

clarity or precision that a more sophisticated person might.[2]

48.     Despite the fact that the vaccine was developed under the leadership of a Republican president, that taking the vaccine was supported by a Republican president, and the vaccine mandate was implemented under a Democratic president, those like Plaintiff who expressed a religious objection, were treated by Honeywell and minimized as individuals whose objections were based on politics and not religion.

49.     Honeywell created a daily culture of pressure and intimidation as it related to individuals who had an objection against receiving the vaccine by the constant implication of job loss. Thus Honeywell instilled fear in its religiously objecting employees that they would not have a way to provide income for their family and face homelessness, or worse, unless they violated their conscious and received the vaccine.

50.     Honeywell set itself up and stood as a religious tribunal and grand inquisitor over those who expressed a desire to be exempted from receiving the COVID-19 vaccine based on religious belief.

51.     Employees of Honeywell, like Mr. Bazuaye, felt as if the decision process for granting an exemption was highly subjective on the part of Honeywell, and the activities of Honeywell management led employees to fear their religious rights would be ignored or marginalized as political issue.

52.     The pressure was such that multiple employees quit.

53.     Other employees who had religious objections nevertheless received the

_____

[2] *Id.* At 715.

vaccine despite their objection for fear of losing employment and finding reemployment.

54.    Honeywell constantly told and reminded employees of the need to get vaccines and went so far as to recommend the vaccine to its employees as if it was practicing medicine.

55.    As part of Honeywell's activity and pattern of religious harassment, it developed and promulgated documents as a form of religious litmus test (aimed at those who objected to the abortion-connection of the COVID-19 vaccine) to identify and inform them of inconsistent nuisances with regard to their religious beliefs.

56.    This questionnaire, dated October 11, 2021, included multiple invasive questions about the requesting employee's religious practices, past vaccination practices for the employee and family, and a request for an explanation about such practices.

57.    By virtue of promulgating this questionnaire, Honeywell,  as a matter of company policy, doubted the sincerity of the articulated religious belief of any vaccine objector, and sought to undermine the request as a mere political belief.

58.    These inquiries came merely as a result of asking for an exemption and before Honeywell had any information about the nature of the religious belief or practice that formed the basis of the employee's request.

59.    In submitting these inquiries, considering their extreme and invasive scope, as well as indiscriminate attestations pertaining to future medical treatments, and demanding completion of the forms under threat of disciplinary action, including termination, Honeywell harassed individuals based on religious grounds.

60.    The employees seeking religious objections, like Mr. Bazuaye, suffered in a hostile environment and suffered retaliation based on religious beliefs during the course of time after Honeywell announced the mandate, which continued on a daily basis as long as Mr. Bazuaye remained employed with Honeywell.

61.    Continuing with its harassment and retaliation against Mr. Bazuaye, and less than two weeks after he submitted his religious accommodation request, on October 18, 2021, Mr. Bazuaye was called away from his work activities, and along with a Local 778 representative and multiple security guards, was taken into another meeting with Human Resources.

62.    When Mr. Bazuaye walked into the meeting, he was met by Sue Zacarias and two Local 778 Representatives, one of whom was Jayson Daugherty, a Caucasian.

63.    During the meeting, Jayson Daugherty took off his mask, but was not disciplined or admonished for doing so.

64.    During that meeting, Zacarias informed Mr. Bazuaye that he had allegedly breached some unidentified health and safety protocols and then was walked out of the office by Matt Stawartz and Honeywell security who collected Mr. Bazuaye's badge and walked him out of the Honeywell facility.

65.    On October 25, 2021 Mr. Bazuaye received a termination memo that stated Honeywell had conducted an investigation and determined he had engaged in an "intentional disregard" of safety protocols and also questioned the "integrity" of information he had provided to other human resources and management personnel with regard to his religious

exemption request.

66. White employees who filed exemption requests were not subject to discipline or termination.

67. Mr. Bazuaye was the only African-American on his work unit to request a religious accommodation, and was fired shortly after doing so.

68. Following his termination, Local 778 filed a grievance on Mr. Bazuaye's behalf which was followed by a November 3, 2021 grievance hearing by phone.

69. During the grievance hearing, Mr. Bazuaye was quizzed by Sue Zacarias about whether he had ever not been wearing a mask, to which Mr. Bazuaye explained that it depends, because the company had exceptions to the mask policy depending on various circumstances.

70. During the hearing it was disclosed that Mr. Bazuaye at times did not have his mask over his nose, however, it was also disclosed that many employees did not have their masks over their noses at all times.

71. In fact, Mr. Bazuaye stated during the grievance, that he personally had to ask other employees to pull their masks up.

72. On information and belief, after that meeting, Honeywell provided a responsive to the grievance.

73. On December 15, 2021 Mr. Bazuaye had a meeting with Local 778 during which Plaintiff was asked again some detailed questions about his mask etiquette and the Covid vaccine.

74. Mr. Bazuaye was told by Local 778 representative, Landon Minor, that Local 778 was going to continue to fight for him.

75. On January 10, 2022, Plaintiff was informed that Local 778 dropped his grievance and in support claimed the reason was because Mr. Bazuaye had been found not wearing a mask during a point in time that only vaccinated people were able to remove it.

76. At no time prior to Mr. Bazuaye's termination was he reprimanded for his mask etiquette or for not wearing a mask at times that he was supposed to have been wearing a mask, if indeed he had been seen in breach of the rules about mask etiquette, but Mr. Bazuaye.

77. Mr. Bazuaye received no due process with respect to the reason for his termination.

78. There were Caucasian employees who did not wear a mask at all times when they should have been wearing a mask who were not terminated or disciplined.

79. It was common for other employees of Defendant Honeywell to remove or lower their masks when talking but they were not disciplined.

80. Sometimes masks broke while employees were at work.

81. In those instances, employees would need to get another mask at work to replace the broken mask.

82. Mr. Bazuaye's mask also broke at work.

83. Local 778 withdrew and failed to forward Mr. Bazuaye's grievance in bad faith.

84.     Local 778 failed to comply with its duties and responsibilities under the Union contract.

85.     Local 778 explicitly had evidence of Honeywell's lack of good cause for terminating Plaintiff in that it applied disciplinary action (i.e. termination) against Plaintiff for actions that other employees did not receive even so much as a write-up for.

86.     Local 778 unlawfully, arbitrarily, discriminatorily and in bad faith, mishandled and failed to pursue Mr. Bazuaye's grievance through the procedure outlined in the Collective Bargaining Agreement (CBA).

87.     Had Local 778 performed its responsibilities properly, either through the grievance or arbitration process, Mr. Bazuaye would have been returned to work because Honeywell fired him without good cause.

88.     Honeywell lacked good and sufficient cause in its decision to fire Plaintiff and instead manufactured reasons for terminating Mr. Bazuaye, and otherwise treated Plaintiff with harsher disciplinary standards than other similarly situated employees.

## COUNT I -HYBRID LMRA SECTION 301 CLAIM AGAINST BOTH DEFENDANTS

89.     Plaintiff hereby incorporates by reference each and every allegation and averment in the preceding paragraphs as though fully set forth herein.

90.     Plaintiff worked under a collective bargaining agreement (CBA) contract that set forth the terms and conditions of his employment with Defendant Honeywell and Defendant Local 778 owed Plaintiff certain duties in representing his interests as to his employment under the terms of that collective bargaining agreement.

91.     Plaintiff was subject to disciplinary action, specifically suspension/termination, by Defendant Honeywell that was not in accord with the terms of the CBA.

92.     Defendant Local 778 failed to pursue Plaintiff's interests in accord with its obligations under the CBA and/or the LMRA and thereby breached its duty of fair representation because it failed to pursue his otherwise meritorious grievance and/or arbitration against Defendant Honeywell.

93.     The breach by Defendant Local 778 tainted the grievance procedure process such that the outcome of the process more than likely was affected by the Local 778's breach.

94.     Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action, which has been filed within the requisite statute of limitations.

95.     As a direct result of the unlawful conduct of Defendants, as set forth herein, Plaintiff has lost wages and benefits, reputation, mental anguish, emotional distress, pain and suffering, a detrimental job record, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses, all of a continuing nature.

96.     The conduct of Defendants was outrageous and evidenced an evil motive or reckless indifference for the rights of Plaintiff and the rights of others, entitling Plaintiff to an award of punitive damages.

97.     Plaintiff is also entitled to recover all of his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for actual, compensatory and punitive damages, all costs, expenses and attorneys' fees incurred herein, for appropriate equitable relief, for interest at the highest lawful rate, and for such other relief as the Court deems just and proper.

## COUNT II - RELIGIOUS DISCRIMINATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE MHRA AND TITLE VII AGAINST HONEYWELL

98.     Plaintiff hereby incorporates the foregoing paragraphs by reference.

99.     Honeywell knew or should have known it did not need to treat individuals, who, like Plaintiff, sought religious exemptions from complying with Honeywell's policy, than those who did not have such objections because the COVID-19 vaccine's waning effectiveness made it unnecessary to treat religious objectors, like Plaintiff, different than those who did not receive the vaccine.

100.     Defendant Honeywell, in light of the available evidence regarding the spread of the COVID-19 despite widespread use of the vaccine across the word, knew or should have known there was no need to scrutinize, humiliate, harass or discipline individuals, like Plaintiff who held a religious objection receiving the COVID-19 mRNA vaccine.

101.     Nevertheless, Defendant Honeywell proceeded to create a hostile work environment based on religion when it implemented its extreme and invasive inquisitorial procedures on Plaintiff and all individuals who sought or harbored religious objections against taking the COVID-19 mRNA vaccine.

102.    Plaintiff as among the first to seek a religious exemption was subject to harassment, discrimination, and disciplinary action in the form of termination, scrutinizing and disrespectful interviews by Defendant based on his religious beliefs.

103.    Plaintiff had deeply held religious beliefs that were subject to disregard and ridicule by Defendant in light of the manner in which it proceeded to evaluate religious exemptions and treat employees who had such exemptions.

104.    Plaintiff endured a religiously hostile work environment that was severe and pervasive and persisted for weeks in the face of his and many of his coworkers' religious objection to receiving a vaccination against COVID-19.

105.    Plaintiff was terminated by Defendant less than a month after articulating his religious exemption and being interviewed by Defendant's Human Recourses department for pretextual reasons that he violated Defendant Honeywell's mask policy.

106.    Defendant did not follow ordinary progressive discipline policies as to Plaintiff based on his religion as it moved forward with terminating Plaintiff.

107.    Plaintiff was denied a reasonable accommodation for his religion and instead fired for pretextual reasons related to his exercise of his religious beliefs.

108.    Defendant treated Plaintiff more harshly than employees on account of his religion and his asserted religious beliefs when Defendant disciplined and terminated Plaintiff instead of issuing him less severe disciplinary action on account of alleged breaches of mask etiquette and other alleged pretextual reasons for termination.

109.     Plaintiff caused a charge of discrimination to be filed with state and federal agencies within the appropriate time period, and Plaintiff filed this petition within ninety days after the date of his receipt of a right to sue letter.

110.     As such, this action is timely, and Plaintiff has exhausted all administrative prerequisites to filing this action.

111.     As a direct result of the unlawful conduct of Defendant, as set forth herein, Plaintiff has suffered damages which include lost wages, lost reputation, mental anguish, emotional distress, pain and suffering, a detrimental job record, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses, all of a continuing nature.

112.     Defendant's discrimination and retaliation was intentional and in reckless disregard of Plaintiff's rights to be free of discrimination on account of his religion, thereby entitling him to punitive damages.

WHEREFORE Plaintiff prays for judgment against Defendant and an award for his economic damages, compensatory damages, emotional distress, pre and post-judgment interest, attorneys' fees, punitive damages and any other relief the Court deems just and equitable.

### COUNT III - RACE & COLOR DISCRIMINATION IN VIOLATION OF THE MHRA, TITLE VII AGAINST HONEYWELL AND SECTION 1981 AGAINST HONEYWELL AND LOCAL 778

113.     Plaintiff hereby incorporates the foregoing paragraphs by reference.

114.   Plaintiff was subject to discrimination and disciplinary action based on his race, black.

115.   Defendant did not follow its ordinary policies and procedures, including its progressive discipline policy, with regard to Plaintiff as compared to Caucasian individuals (without regard to vaccination status or religious exemption requests) when it proceeded to terminate Plaintiff.

116.   Plaintiff was the only African-American in his department to seek a religious accommodation and was terminated shortly after seeking such an accommodation.

117.   Caucasian employees who sought accommodations were not terminated.

118.   Plaintiff was subject to higher scrutiny than similarly situated coworkers on account of his race when he was subjected to disciplinary action and termination which, when compared to Caucasian individuals who engaged in similar alleged misconduct.

119.   Plaintiff's race played a substantial role in the adverse actions taken against him.

120.   The terms and conditions of Plaintiff's employment were adversely affected because of his race.

121.   Other Caucasian employees were not subject to discipline or scrutiny or termination with respect to work expectations considering COVID-19 polices, but Plaintiff was both disciplined and ultimately terminated on account of his race.

122.   Caucasian employees who sought religious accommodations were not terminated.

123. Plaintiff filed a charge of discrimination with the Missouri Commission on Human Rights and EEOC within the appropriate time period, and Plaintiff filed this Complaint within ninety days after the date of his receipt of his right to sue letter(s).

124. As such, this action is timely, and Plaintiff has exhausted all administrative prerequisites to filing this action.

125. As a direct result of the unlawful conduct of Defendant, as set forth herein, Plaintiff has suffered damages which include lost wages, lost reputation, mental anguish, emotional distress, pain and suffering, a detrimental job record, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses, all of a continuing nature.

126. Defendant's acts were willful and taken in reckless disregard for Plaintiff's rights to be free of discrimination and retaliation such that Plaintiff is entitled to punitive damages.

WHEREFORE Plaintiff prays for judgment against Defendant and an award for his economic damages, compensatory damages, emotional distress, pre and post-judgment interest, attorneys' fees, punitive damages and any other relief the Court deems just and equitable.

## COUNT IV – DISABILITY DISCRIMINATION IN VIOLATION OF THE MHRA & AMERICANS WITH DISABILITIES ACT AGAINST HONEYWELL

127. Plaintiff hereby incorporates the foregoing paragraphs by reference.

128. Plaintiff was subject to discrimination and disciplinary action based on a perceived disability because he did not have the vaccine induced spike protein as part of his bodily function, he was not as capable or desirable of an employee and therefore subject to

differential treatment, greater scrutiny and discipline of his work activity and conduct as compared to vaccinated individuals.

129. Defendant did not follow its ordinary policies and procedures with regard to Plaintiff as compared to Caucasian individuals when it proceeded to terminate Plaintiff because of his unwillingness to receive the COVID-19 vaccine (i.e. that Plaintiff was regarded as unable to perform essential functions of his job without the presence of the vaccine induced spike protein in his body).

130. Defendant terminated Plaintiff's employment based on the perception he was disabled as a result of not having received the COVID-19 vaccine.

131. Plaintiff was subject to higher scrutiny than similarly situated coworkers on account of Defendant perceiving him as disabled for not having received the COVID-19 vaccine when compared to employees who did.

132. Employees who did receive the COVID-19 vaccine and who therefore were able to work under relaxed work expectation as compared to Plaintiff.

133. In fact, however, there was no measurable basis on which to determine that individuals who had the vaccine-induced spike protein, as compared to those who did not.

134. The terms and conditions of Plaintiff's employment were adversely affected because of this perceived disability.

135. Plaintiff filed a charge of discrimination with the Missouri Commission on Human Rights and EEOC within the appropriate time period, and Plaintiff filed this Complaint within ninety days after the date of his receipt of his right to sue letter(s).

136.    As such, this action is timely, and Plaintiff has exhausted all administrative prerequisites to filing this action.

137.    As a direct result of the unlawful conduct of Defendant, as set forth herein, Plaintiff has suffered damages which include lost wages, lost reputation, mental anguish, emotional distress, pain and suffering, a detrimental job record, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses, all of a continuing nature.

138.    Defendant's acts were willful and taken in reckless disregard for Plaintiff's rights to be free of discrimination and retaliation such that Plaintiff is entitled to punitive damages.

WHEREFORE Plaintiff prays for judgment against Defendant and an award for his economic damages, compensatory damages, emotional distress, pre and post-judgment interest, attorneys' fees, punitive damages and any other relief the Court deems just and equitable.

## COUNT V - RETALIATION IN VIOLATION OF THE MHRA & TITLE VII AGAINST HONEYWELL

139.    Plaintiff hereby incorporates the foregoing paragraphs by reference.

140.    Plaintiff was subject to discrimination and disciplinary action based on his protected activity of seeking religious accommodations, opposing the mandated vaccine in violation of individual's religious rights, and against a policy that discriminated against people based on perceived disabilities for not having been vaccinated against COVID-19.

141. Plaintiff was terminated within a month of engaging in the protected activity of seeking religious accommodation to exempt him from receiving the COVID-19 vaccine.

142. Plaintiff spoke against and engaged in protected activity by advocating against a policy that discriminated against individuals based on the perceived disability on account of not having the presence of the spike protein induced by a COVID-19 vaccine in their body.

143. Defendant did not follow its ordinary policies and procedures with regard to Plaintiff.

144. Plaintiff was subject to higher scrutiny than similarly situated coworkers on account of his protected activity.

145. Plaintiff's protected activity played a substantial role in the adverse actions, including disciplinary action and termination, taken against him.

146. Plaintiff filed a charge of discrimination with the Missouri Commission on Human Rights and EEOC within the appropriate time period, and Plaintiff filed this Complaint within ninety days after the date of his receipt of his right to sue letter(s).

147. As such, this action is timely, and Plaintiff has exhausted all administrative prerequisites to filing this action.

148. As a direct result of the unlawful conduct of Defendant, as set forth herein, Plaintiff has suffered damages which include lost wages, lost reputation, mental anguish, emotional distress, pain and suffering, a detrimental job record, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses, all of a continuing nature.

149.    Defendant's acts were willful and taken in reckless disregard for Plaintiff's rights to be free of discrimination and retaliation such that Plaintiff is entitled to punitive damages.

WHEREFORE Plaintiff prays for judgment against Defendant and an award for his economic damages, compensatory damages, emotional distress, pre and post-judgment interest, attorneys' fees, punitive damages and any other relief the Court deems just and equitable.

## DEMAND FOR JURY AND PLACE OF TRIAL

Plaintiff hereby demands a jury trial to be held in Kansas City, Missouri.

Respectfully Submitted,

**THE MEYERS LAW FIRM LC**

By: /s/ Kevin C. Koc                 .
    Kevin C. Koc, MO #56955
    4435 Main Street Ste 503
    Kansas City, Missouri 64111
    (816) 444-8500 Telephone
    (816) 444-8508  Facsimile
    kkoc@meyerslaw.com
    **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that he served the foregoing on all counsel of record by filing it with the ECF system of the Western District of Missouri on June 23, 2023.

/s/ Kevin C. Koc.